(August 3, 2000)

■ SHARI LO PRESTI, Appellant, v HOSPITAL FOR JOINT DIS-
EASES et al., Respondents. [712 NYS2d 110] —Judgment, Supreme
Court, New York County (Robert Lippmann, J.), entered April
22, 1999, granting defendants' motion to dismiss the complaint
at the close of the evidence, unanimously reversed, on the law,
without costs, defendants' motion denied, the complaint
reinstated and a new trial ordered.

On May 29, 1996, defendant Dr. Michael Neuwirth, the Chief
of Spinal Surgery at defendant Hospital for Joint Diseases,
performed a disectomy on plaintiff Shari Lo Presti. The surgery
involved removing part of the herniated disc and inserting
metal rods as well as bone grafts from elsewhere in the
patient's body. Plaintiff alleges that right after the surgery she
experienced severe pain in her left foot, which condition
persisted up to the time of trial. Her treating physician, Dr.
Hainline, diagnosed the problem as reflex sympathetic dystro-
phy (RSD) caused by damage to the sural nerve, which is a
sensory nerve in the lower leg.

Plaintiff does not argue that the spinal surgery was improp-
erly performed. The risks of such surgery did not include injury
to the sural nerve, which was outside the operative field.
Rather, she claims that defendants negligently positioned her
on the operating table, causing compression of the nerve. Since
she was unconscious during the surgery and sedated with
painkillers for hours thereafter, she could not say exactly what
caused the nerve compression, but she and her expert wit-
nesses opined that either the operating table straps or the
anti-embolic stockings (TEDs) and sequential compression de-
vices (SCDs) on her legs were too tight.

SCDs and TEDs prevent bed-bound patients from developing
blood clots because their leg muscles are not active. The TEDs,

which are long surgical stockings, are put on first and the SCDs over them. SCDs are plastic battery-operated devices which inflate and deflate every few seconds to compress the leg muscles and facilitate circulation. They extend from the ankle to the mid-thigh and are secured with Velcro straps. These devices cover the portion of the leg where the sural nerve comes close to the surface of the skin. Plaintiff was fitted with SCDs and TEDs in the operating room, and they were not taken off until June 1, 1996, the night before she was discharged from the hospital.

The Jackson spinal table is a type of operating table specially designed for spinal surgery. The patient is placed in a face-down position, bent at the hips, so that the upper legs are angled down into the sling or basket that is slung below table level. The knees are then bent up at about a 30-degree angle, with the feet slightly higher than the head. The table is equipped with two sets of straps that go around the thighs and the calves to hold the patient in place. However, defendants allege that the calf straps were not used on plaintiff.

Blankets and pillows are supposed to be placed between the patient's leg and the strap as a further precaution against bruising or nerve compression from a too-tight strap. Dr. Neuwirth and Nurse Vintayen, the operating nurse, testified that there were pillows and a blanket on plaintiff's legs. However, plaintiff testified that immediately after the surgery, she had deep marks on her thighs from the thigh straps. This led her to believe that defendants used insufficient cushioning or none at all.

Dr. Hainline did not think that compression on the thigh would affect the sural nerve because it is not a distinct nerve above the knee. He claimed that a tight calf strap or SCD could have compressed the nerve and caused plaintiff's RSD. However, plaintiff's expert Dr. Waltz, a neurosurgeon, said that since the sensory fibers that are going to make up the sural nerve originate in different locations in different people, they could have been compressed by the mid-thigh strap.

Noting that the causes of RSD are not fully known, both Dr. Neuwirth and defendants' expert Dr. Bonomo contended that even if there were a tight strap or SCD on plaintiff's leg, this could not have injured the sural nerve. A nerve compression occurs when the nerve is pressed against bone, but the nerve is not close to the bone at the point where it is close to the surface of the skin. Plaintiff's symptoms could have resulted from a condition that existed before the operation, such as her radiculopathy and herniated discs, or could have been triggered by the trauma of surgery on her autonomic nervous system.

The parties also disputed whether the condition even arose in the hospital. If she had a compressed nerve while she was in the hospital recovering from surgery, it would be expected that she would have been in obvious pain from the action of the SCDs, but the hospital records do not indicate that she complained of pain in her left leg until June 2. On the other hand, plaintiff was under heavy sedation, which could have masked the RSD symptoms temporarily. Moreover, Nurse Reid, the private duty nurse hired by plaintiff's family to care for her in the hospital, testified that plaintiff was in terrible pain and consistently complained about her left leg. The hospital staff, who spent less time with plaintiff, might not have distinguished between the lower leg symptoms and the other post-operative pains for which plaintiff requested painkillers.

Plaintiff's counsel's theory of the case was res ipsa loquitur. The exact instrumentality that caused the injury was unknown, but defendants had exclusive control over such instrumentality because plaintiff was unconscious in their care, and the incident was not one that would ordinarily occur in the absence of negligence because it was not a risk of the surgery. The court granted defendants' motion for a trial order of dismissal because it deemed res ipsa loquitur to be inapplicable where, as here, expert testimony is needed to explain whether such an injury would not occur in the absence of negligence (*compare*, *Kerber v Sarles*, 151 AD2d 1031 [plaintiff went under general anesthesia for toe surgery and awoke to find front teeth missing]). However, the inquiry does not end there.

Whether or not res ipsa loquitur was applicable here, plaintiff presented sufficient evidence of negligence to go to the jury. Based on their review of plaintiff's condition and their knowledge of anatomy, Dr. Hainline and Dr. Waltz testified that the mechanism that could have caused her injury was an improperly tight strap and/or SCD on her left leg. Defendants' witnesses offered their own medical reasons for disagreeing with plaintiff's theory of causation, but this merely created a triable issue. "To establish a prima facie case plaintiff need not eliminate entirely all possibility that defendant's conduct was not a cause, but only offer sufficient evidence from which reasonable [persons] may conclude that it is more probable that the injury was caused by defendant than that it was not." (*Monahan v Weichert*, 82 AD2d 102, 108.)

Plaintiff's testimony about the marks on her thighs contradicted the operating room nurse's assertion that there was padding under the thigh straps. This conflict in turn casts doubt on defendants' account of the operating room procedures,

including their claim that calf straps were not used. Additionally, there was strong evidence that the condition arose while she was in the hospital and that her pain was qualitatively different from any problems she had had before the surgery. The jury should have been allowed to resolve these factual disputes (*see, Hughes v Temple*, 187 AD2d 956 ["When varying inferences are possible, proximate cause presents a question of fact for the jury."]). Concur—Sullivan, P. J., Rosenberger, Nardelli, Ellerin and Wallach, JJ.